IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

May 23, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

Robert Bruce Williams,                  )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )          Civil Action No. 5:22-cv-00061
                                        )
B-A-R-C Electric Cooperative            )
                                        )
                    and                 )
                                        )
BARConnects, LLC,                       )
                                        )
                    Defendants.         )

## MEMORANDUM OPINION

Plaintiff Robert Bruce Williams alleges that he faced a series of adverse employment actions after he informed his employer of his major depression diagnosis. His complaint raises six claims against the two Defendants, B-A-R-C Electric Cooperative ("B-A-R-C") and BARConnects, LLC ("BARConnects"). Defendants moved for summary judgment on all six claims. However, in responding to the summary judgment motion, Williams appears to have abandoned three of the claims. The remaining three claims allege causes of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, for (1) retaliation, (2) interference, and (3) failure to accommodate.

This matter is before the court on a motion for summary judgment filed by Defendants. (Dkt. 26.) For the reasons discussed below, the court will grant in part, and deny in part, Defendants' motion.

# I.    Background

## A.    Factual History

As an initial matter, Williams' brief in opposition does not dispute or respond to the majority of Defendants' statement of undisputed material facts. Instead, Williams' brief in opposition asserts that only *four* "material facts are genuinely disputed."[1] (Dkt. 28 at 2.) Nonetheless, the court considers Williams' factual background as a whole and reviews it to identify any additional material facts that might reasonably be in dispute. *See Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 743–44 (E.D. Va. 2017).

Upon review, it is clear that Williams does not specifically contest many of the undisputed material facts Defendants submit in their memorandum. Under Federal Rule of Civil Procedure 56(e), since Williams has "fail[ed] to properly address another party's assertion of fact as required by Rule 56(c)," the court will "consider the fact[s] undisputed for purposes of the motion" when appropriate. Fed. R. Civ. P. 56(e); *see Gainer v. Breckon*, No. 7:19CV00449, 2020 WL 5526544, at *3 (W.D. Va. Sept. 8, 2020) (finding fact undisputed for purposes of the motion because plaintiff failed to address assertions), *report and recommendation adopted*, No. 7:19CV00449, 2020 WL 5832061 (W.D. Va. Sept. 30, 2020); *Hartford Fire Ins. Co. v. Help U Move, LLC*, No. 5:14-cv-00018, 2015 WL 4393791, at *1 n.2 (W.D. Va. July 16, 2015) (considering facts undisputed for the purpose of resolving the motion when the plaintiff failed to produce materials to support denials). Accordingly, the background recited in this section

---

[1] According to Williams, those four disputed facts include whether "(1) Mr. Williams was qualified to perform the duties of a network engineer; (2) Mr. Williams satisfied [B-A-R-C's] legitimate expectations regarding work performance; (3) [B-A-R-C] demoted Mr. Williams; and (4) Mr. Williams suffered a constructive discharge." (Dkt. 28 at 2.)

contains undisputed facts but does not include any fact properly disputed by Williams or Defendants unless otherwise noted.

1. The parties.

Williams has worked in the IT field, including system and network administration, for nearly 40 years. (Dep. of Robert B. Williams, September 28, 2023, at 17:11–15 (Dkt. 28-9) [hereinafter "Williams Dep."].) He was diagnosed with biologically-based major depression in 1999. (*Id.* at 15:18–23.) His symptoms include lethargy, general fatigue, and a low tolerance for stress of any kind. (*Id.* at 16:5–12.) Those symptoms are not always present and Williams takes medication to alleviate them. (*Id.* at 16:10–17:3.) However, his symptoms can be "exacerbated by high levels of stress." (*Id.*) At some point, Williams held a certification as a "Junos network associate," as well as several other certifications. (*Id.* at 36:22–37:21, 39:14–16.)

B-A-R-C is a member-owned electric distribution cooperative which serves electricity on a non-profit basis to approximately 10,000 consumers. (Aff. of Michael Keyser ¶ 2 (Dkt. 26-1) [hereinafter "Keyser Aff."].) B-A-R-C also maintains a fiber subsidiary, BARConnects. (*Id.* ¶ 3.) Multiple employees who work at B-A-R-C divide some of their time between B-A-R-C and BARConnects. (*Id.*) During the relevant period, Michael Keyser was B-A-R-C's Chief Executive Officer, (*id.* ¶ 1), and Jamie Lowry was B-A-R-C's Chief Operating Officer (Dep. of Jamie Lowry, October 20, 2023, at 7:10–12 (Dkt. 28-7) [hereinafter "Lowry Dep."]).

2. Williams begins work with BARC.

Williams began working for B-A-R-C on March 14, 2016, as a Database Administrator in its IT Department. (Williams Dep. at 41:4–9.) In March 2018, Williams transitioned roles

to assisting Gary Sickler as a "Junior Network Engineer." (*Id.* at 35:19–23, 43:3–12, 46:12–18.) Williams worked well with Sickler, whom Williams described as a "very good friend." (*Id.* at 70:3–5, 214:13–15.)

3. Williams discloses his depression diagnosis.

Keyser emailed Williams on March 7, 2018, requesting a meeting regarding three complaints he had received concerning Williams' work. (*Id.* at 49:10–50:13.) At the meeting, he was reprimanded by Keyser but did not receive a written reprimand letter at that time. (*Id.* at 60:23–61:1, 62:23–63:1.) Williams disagreed with Keyser's concerns regarding the complaints. (*Id.* at 61:2–4.)

It was during this meeting that Williams first disclosed to Keyser that he had depression. (*Id.* at 58:8–13.) In this meeting, Williams simply mentioned his depression and did not request any accommodation. (*Id.* at 64:10–16.) At the time, in 2018, with respect to his disclosure of depression, Williams did not experience any threats, coercion, intimidation, or interference for that condition. (*Id.* at 66:7–13.) By December 2018, on Sickler's recommendation, B-A-R-C promoted Williams from a "Junior Network Engineer" to a "Network Engineer." (Keyser Aff. ¶ 5; Compl. ¶ 12 (Dkt. 1).)

4. Sickler departs B-A-R-C.

Sickler departed B-A-R-C in May 2020. (Williams Dep. at 36:14–21.) Following Sickler's departure, Williams reported directly to Jamie Lowry until JT Hartzler was hired. (*Id.*) Hartzler was hired in June 2020 as a "Senior Network Engineer" and took over as Williams' direct supervisor from Lowry. (*Id.* at 36:19–21, 131:4–6.)

5. The July 2020 Annual Performance Review.

In July 2020, Williams received a performance review from Lowry for the period of July 2019 to June 2020. (Dkt. 28-1 at 1.) The review provided a ranking on a scale of 1 (being the lowest) to 5 (being the highest) across various "core value[s]" for Williams' work as a Network Engineer. A score of 3 meant "[j]ust average" and a score of 4 meant that the "[s]upervisor can cite to several tangible, actual examples throughout the year where [Williams] exemplified [Defendants'] values." (*Id.*) Lowry gave Williams scores of 3s and 4s in every category. (*Id.*)

6. The August 3, 2020 Reprimand.

Following his annual performance review, Hartzler and Lowry presented Williams with a written reprimand on August 3, 2020. The reprimand was signed by Keyser and "serve[d] as a formal reprimand letter for unsatisfactory performance." (Dkt. 28-2.) In particular, the letter stressed what it described as an inadequate performance with respect to "troubleshooting the 844E on or about 7/27/2020." (*Id.* at 1.) The letter blamed Williams for providing "incorrect information . . . which caused quite a bit of panic and confusion," and prevented some in-home installations for new customers. (*Id.*) Williams disagreed with the substance of the criticism. (Williams Dep. at 28:21–29:15.) Additionally, during this meeting, Williams referenced the ADA for the first time. (*Id.* at 29:18–21, 161:3–15.)

7. Williams goes on medical leave.

The day after receiving the reprimand, on August 4, 2020, Williams visited his nurse practitioner after experiencing increased symptoms related to his depression. (Dkt. 26-14; 26-12 at 1–2.) Williams' healthcare provider wrote him an excuse from work for two weeks starting on August 4, 2020. (*Id.*) When his symptoms continued, Williams obtained a second

release from his healthcare provider and scheduled vacation leave and sick leave through August 31, 2020. (Dkt. 26-19 at 1–2.)

On August 26, 2020, Williams wrote an email to Keyser attaching an ADA form and list of requested accommodations. (Dkt. 26-22 at 1.) The form detailed the nature of Williams' limitations—including "[c]linical depression that, at times, affects numerous daily life activities," complicated by his "asthma, symptoms from type-2 diabetes, and back and neck injuries from a car accident." (*Id.* at 4.) As for accommodations, Williams proposed five. First, he requested that he be allowed the ability to indicate times he is overloaded with work and to signal that he needed time to catch up on old assignments before being assigned new work. (*Id.* at 5.) Second, he requested that he be able to "work in an environment fostered on mutual professional respect." (*Id.*) Third, he requested he be permitted to park closer to the office. (*Id.*) Fourth, he requested he be allowed to take a ten-minute walking break outside during the day. (*Id.*) Fifth and finally, he requested the ability to telework at least one day a week. (*Id.*)

In the same email, Williams also requested that Defendants continue him on his medical leave from August 31, 2020 until September 3, 2020 using his remaining vacation hours. (*Id.* at 1.) Additionally, Williams signaled that he would be applying for FMLA leave to begin on September 4, 2020.

8. Williams is sent a job description for "Network Technician."

In response to Williams' accommodation request, Keyser created a new position for Williams entitled "Network Technician." (Keyser Aff. ¶ 9; Dkt. 26-24 at 2.) The job description for the role was sent to Williams via email on September 1, 2020. (Dkt. 26-24 at

1–2.)  The job primarily entailed "assisting network engineers" with various tasks.  (*Id.* at 2.)
The position required no certifications and only required "a high school degree or GED
equivalent."  (*Id.* at 3.)

Keyser asserts that the new role for Williams was better suited for Williams' skills and
ability.  (Keyser Aff. ¶ 9.)  Keyser believed so because this new role would relieve Williams of
having to report to Keyser and allow him to continue working on "tasks that were within his
skill set and that he enjoyed performing."  (*Id.* ¶ 10.)  Keyser contends Williams would have
received the same rate of pay with the same benefits under the new role.  (*Id.*)

Williams was unhappy with this job description and proposed role.  (Williams Dep. at
243:13–15.)  By removing education requirements, training needs, and other responsibilities,
Williams felt this role was a "complete demotion for somebody with . . . almost 40 years of IT
experience."  (*Id.* at 250:9–13.)  And the role required none of the professional certifications
he held and eliminated the responsibilities he had with a particular type of equipment called
"Juniper," which Williams described as a "significant and complex part" of his network
engineer position.  (*Id.* at 247:10–20.)  Finally, Williams pointed out that the new role did
nothing to address the five ADA accommodation requests he submitted.  (*Id.*)

Later that day, Williams returned his FMLA paperwork to B-A-R-C.  (*See* Dkt. 26-25.)
The paperwork, filled out by Williams' healthcare provider, stated that Williams' depression
would last his "lifetime," that the condition was "permanent or long term" due to his
"incapacity," and that because of the condition, he will be "incapacitated for a continuous
period of time," starting August 4, 2020, throughout his "lifetime."  (*Id.* at 6–9.)  The healthcare

provider also wrote that because of his depression, Williams is not able to "[c]ollaborat[e] with upper management due to the hostile and aggressive work environment." (*Id.* at 9.)

9. <u>Williams' medical leave is extended through January 2021, and he resigns from BARC on January 14, 2021.</u>

On November 17, 2020, Williams wrote a letter to Keyser requesting that he receive an additional 60 days of medical leave through January 31, 2021. (Dkt. 28-5.) Williams attached a communication from his healthcare provider requesting the extension. (*Id.* at 2.)

On January 14, 2021, through counsel, Williams transmitted a "Notice of Resignation" to Defendants. (*See* Keyser Aff. Ex. A (Dkt. 26-1 at 4–7).) In that notice, counsel stated that Williams had "visited his healthcare provider [the day before] and was advised that he should not return to work at BARC due to health concerns." (*Id.* at 6.) Enclosed with that notice was a letter from Williams' healthcare provider who stated that "a return to work would almost certainly exacerbate" his "history of recurrent major depressive disorder." (*Id.* at 7.) The same day, Defendants accepted Williams' resignation. (*Id.* at 4.)

10. <u>Williams files his EEOC Charge.</u>

On June 1, 2021, Williams filed a Charge of Discrimination with the EEOC. (Keyser Aff. Ex. B (Dkt. 26-1 at 8–11).) The Charge of Discrimination specifies the time period in which "discrimination took place" as between September 1, 2020, through his resignation on January 14, 2021. (*Id.* at 8.)

## B.    Procedural History

On October 19, 2022, Williams filed this lawsuit against B-A-R-C and BARConnects in the U.S. District Court for the Western District of Virginia, Harrisonburg Division. (Compl.) His complaint included a total of six causes of action. (*Id.* ¶¶ 47–110.)

Count I alleges that Defendants violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), by taking adverse employment actions against Williams under circumstances that raise a reasonable inference of unlawful discrimination based on a disability. (*Id.* ¶¶ 47–60.)  Count II alleges that Defendants violated the ADA by unlawfully retaliating against Williams based upon his requests for accommodations.  (*Id.* ¶¶ 61–73.)  Count III alleges that Defendants violated the ADA by unlawfully interfering with Williams' rights under the ADA.  (*Id.* ¶¶ 74–83.)  Count IV alleges that Defendants violated the ADA by failing to accommodate Williams.  (*Id.* ¶¶ 84–91.)  Count V alleges that Defendants violated the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), by discriminating and retaliating against Williams.  (*Id.* ¶¶ 92–101.)  And Count VI alleges that Defendants violated the FMLA by interfering with Williams' rights under the FMLA.  (*Id.* ¶¶ 102–10.)

Following discovery, Defendants moved for summary judgment on all six claims.  (Dkt. 26.)  Williams opposes summary judgment as to three of the six claims: (1) Count II (ADA retaliation), (2) Count III (ADA interference), and (3) Count IV (ADA failure to accommodate).  (Dkt. 28 at 1.)  Accordingly, Williams no longer advances Counts I, V, and VI.  (*Id.*)

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Whether a fact is material depends on the relevant substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When considering a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (citation omitted). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Id.* (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### III.    Analysis

In response to Defendants' motion for summary judgment, Williams no longer advances three of his claims—Counts I, V, and VI. (*See* Dkt. 28 at 1.) Accordingly, the court

will grant summary judgment to Defendants on these claims. The three remaining claims Williams asserts—Counts II, III, and IV—arise under the ADA, and are addressed in turn.

## A.     Count II (ADA Retaliation)

In Count II, Williams alleges a claim for retaliation in violation of the ADA. (Compl. ¶¶ 61–73.) Williams claims that B-A-R-C would not have disciplined, demoted, constructively discharged, or taken other discriminatory actions against him "but for [his] requests for accommodation and other protected acts." (*Id.* ¶ 68.)

The ADA prohibits retaliation in 42 U.S.C. § 12203(a), which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). In order to "establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Defendants focus their motion on the second and third prongs: whether Williams suffered any adverse action, and whether a causal link exists between protected conduct and that action.

### 1.     Adverse action.

To prove an adverse action, a plaintiff must show that the employer's action was "materially adverse" to the extent that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Put differently, "the harm must be a '*significant detriment*,' not 'relatively insubstantial or trivial.'" *Id.* (internal quotation marks omitted) (quoting *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015)). While "petty slights, minor annoyances, and simple lack of good manners," will not suffice, *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington N.*, 548 U.S. at 68), "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" can constitute an adverse action. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Based on the summary judgment record, in analyzing adverse actions, the court concludes that a reasonable jury could find that Williams suffered a demotion, but would not find that he suffered a constructive discharge.

a)      Demotion

Williams claims that he was demoted by B-A-R-C in August 2020 from a "Network Engineer" to a "Network Technician."[2] (Dkt. 28 at 8.) Defendants counter that Williams "concede[d] that the new job description proposed by Keyer [sic] and presented to [Williams] . . . would have been a reasonable accommodation," not a demotion. (Dkt. 27 at 11.) As support, Defendants point to one portion of deposition testimony, in which Defendants' counsel asked whether "on the face of" the job description, "it is an accommodation proposal" and Williams agreed, "[o]n the face of it, yes." (Williams Dep. at 274:21–275:1.) They submit that this accommodation comports with EEOC's own regulations, which support the notion that "reassignment can be a form of reasonable

---

[2] Although Williams asserts August 2020 as the timeframe for his demotion, (Dkt. 28 at 8), the court notes that the proposed "Network Technician" role was sent to Williams on September 1, 2020, (Dkt. 26-26 at 2). And correspondence between Keyser and Williams about the role took place on September 4. (*Id.*)

accommodation for a qualified individual with a disability." (Dkt. 27 at 11 (citing 29 C.F.R.

§ 1630.2(o)(2)(ii)).) Finally, they claim that as it was a "mere[] . . . proposal" for a new position,

it could not have harmed Williams. (*Id.*)

In response Williams argues that the proposed accommodation is in fact a demotion.

(*See* Dkt. 28 at 8–9.) As support, he points to his own deposition testimony, in which he states

that the job change was "a complete demotion" for someone with his experience. (Williams

Dep. at 250:10–13.) He next relies on Sickler's deposition, where he testified that a "Network

Engineer" has "more technical knowledge" and is a "more advanced position" than a

"Network Technician." (Dep. of Gary Sickler, November 9, 2023, at 8:19–9:7, 9:15–21 (Dkt.

28-8) [hereinafter "Sickler Dep."].) Additionally, Sickler testified that he considered a

transition from "Network Engineer" to "Network Technician" to be a demotion. (*Id.* at 9:22–

10:10.) Finally, Williams gestures towards Lowry's deposition, in which he responded in the

affirmative to a question concerning his awareness of "Williams ever receiving a demotion in

2020." (Lowry Dep. at 28:20–23, 34:6–7.) Williams also claims that "Lowry testified that this

demotion was Mr. Keyser's decision." (Dkt. 28 at 9 (citing Lowry Dep. at 29:1–2).)

A reasonable jury could find that Williams was demoted. Testimony in the record

creates a genuine issue of material fact as to whether Williams was demoted by being offered

the "Network Technician" role as part of his return. First, in Williams' testimony, he reiterates

that he believed he was being demoted by being offered "a position that a high school graduate

could have been hired for." (Williams Dep. at 209:8–13.) Second, Sickler also testified that

reclassifying someone from "Network Engineer" to "Network Technician" would be a

demotion in his opinion. (Sickler Dep. at 10:9–10.) On the other hand, Lowry's responses to

questions that use the term "demotion" do little to show that Lowry considered the new role to constitute a demotion. None of the cited testimony shows that Lowry agrees with the characterization that Williams was demoted.

More importantly, however, Williams points to specific facts that create a question as to whether the alleged retaliatory action was "materially adverse," meaning that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laird*, 978 F.3d at 893 (internal quotation marks omitted). While there is no dispute that Williams was to be provided the same salary and benefits under the offered role, (Williams Dep. at 259:23–260:2), the loss of job title and responsibility change caused by the offered "Network Technician" is more than a petty slight or minor annoyance. As a result, on this record, a reasonable jury could find that Williams was demoted in August 2020.

b)      Constructive Discharge

Williams claims he was constructively discharged on January 13, 2021. (Dkt. 28 at 11.) Defendants argue that Williams did not suffer an adverse action because he was not constructively discharged during his leave. (Dkt. 27 at 12–14.)

To prove a constructive discharge, "a plaintiff must at the outset show that his employer 'deliberately made [his] working conditions intolerable in an effort to induce [him] to quit.'" *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (quoting *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001)). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004)). The conditions must

go "beyond 'ordinary' discrimination." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)).  The court utilizes an objective, "reasonable person" standard in evaluating whether a plaintiff's workplace was so intolerable that she was compelled to resign.  *Heiko*, 434 F.3d at 262.  "In assessing intolerability, the frequency of the conditions at issue is important." *Evans*, 936 F.3d at 193. Thus, "[t]he more continuous the conduct, the more likely it will establish the required intolerability.  On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.*  Finally, courts in this circuit consider "the totality of the circumstances" in determining whether a resignation was, in fact, a constructive discharge.  *See Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413 (4th Cir. 2010).

Williams claims that he suffered a constructive discharge after his supervisors engaged in "gaslighting," "bullying," and "undermining [his] ability to do [his] work . . . [and] misrepresenting things that happened."  (Williams Dep. at 116:12–18.)  Williams further described his supervisors' conduct as a "consistent pattern of abusive behavior that [he] took to be trying to aggravate [his] medical condition."  (*Id.* at 123:2–7.)  Specifically, Williams asserts that his supervisors mistreated him on at least three occasions, (Dkt. 28 at 9–10), one involving a company credit card he was disallowed in June 2020, (Williams Dep. at 100:15–101:3, 117:9–17), one involving a reprimand following his work related "to a card going bad in the main network controller," (*id.* at 126:3–7), and one involving the reprimand on August 3, 2020, (*id.* at 118:19–21).  Williams also claims that two accommodations requests, one on August 26, 2020, and one on November 17, 2020, either did not address his concerns or went unanswered.  (Dkt. 28 at 10–11.)  And because B-A-R-C did not provide "a meaningful

response," Williams argues he "was constructively discharged under medical advice on or about January 13, 2021." (*Id.* at 11.)

A reasonable jury would not find that Williams was constructively discharged. Williams fails to demonstrate facts from which a reasonable juror could determine that he faced intolerable working conditions, such that he was constructively discharged on or around January 13, 2021. Said differently, Williams proffers no evidence that when he decided to resign on January 13, 2021, "a reasonable person in [his] position would have felt compelled to resign" *because* of his working conditions. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (internal quotation marks omitted). Williams' complaints of intolerability largely stem from feeling unfairly reprimanded by Keyser and Lowry. Unfair or not, such criticism falls short of what the Fourth Circuit deems sufficient to show a constructive discharge. *See, e.g.*, *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (plaintiff being yelled at, told she was a poor manager, given poor evaluations, criticized in front of customers, and required to work with an injury not sufficient to establish objectively intolerable working conditions); *see also Evans*, 936 F.3d at 193 (collecting cases). Indeed, even "[a] slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient evidence of constructive discharge." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (internal quotation marks omitted). Utilizing an objective standard and reviewing the totality of the circumstances, a reasonable person would not have felt compelled to resign. As a result, on this record, a reasonable jury would not find that Williams was constructively discharged in January 2021.

2.    Causation.

To establish causation, a plaintiff bears the burden of establishing "but-for" causation: that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). A plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

To establish a causal relationship between the protected activity and the adverse action, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021). As a result, if the "decisionmaker is unaware of any prior complaints, a plaintiff cannot establish the necessary causal connection." *Id.* (internal quotation marks omitted). Constructive knowledge is not sufficient. *Id.* at 125. Rather, actual knowledge is required. *Id.*

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021); *see Laurent-Workman v. Wormuth*, 54 F.4th 201, 218–19 (4th Cir. 2022). "A plaintiff may establish the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783–84). Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity[.]" *Wormuth*, 54 F.4th at 218 (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)). Notably, "[t]he existence of relevant facts alone, or together with temporal

proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

Defendants argue that Williams "fails to create a reasonable inference of discrimination between any protected conduct and his supposed demotion." (Dkt. 27 at 14.) Defendants claim that "the surrounding circumstances show that BARC was already dissatisfied with Plaintiff's performance in his current assignment, which is an entirely reasonable basis for proposing a different job as part of an accommodation effort." (*Id.*) As support, Defendants point to two parts of Williams' deposition. First, they point to Williams agreeing that Keyser wrote in an email that the Network Technician role "is the accommodation we plan to offer you if/when you return to work." (Williams Dep. at 272:11–15.) Second, they point to two pages in Williams' deposition in which Defendants claim he "speculat[es] as to motive." (Dkt. 27 at 14 (citing Williams Dep. at 269–70).)

Williams counters with what he describes as "direct evidence" of "Keyser express[ing] animus against Mr. Williams' request for an accommodation." (Dkt. 28 at 7.) He points to a "significant email" in which Keyser, in response to Williams' request for an accommodation, wrote to Hartzler: "Real strong of him to step up to the plate. My mind is made up about trying to help him succeed now. This is really unfair to you and BARC." (*Id.* at 7–8; *see* Dkt. 28-3.) That email, from August 4, 2020, was roughly a month before Keyser offered Williams the Network Technician role. (*See* Dkt. 26-24.) Additionally, Williams points to his own testimony in which he relayed that Keyser instructed him not to share information about his disability with anyone at BARC. (Williams Dep. at 66:14–67:18.)

- 18 -

Williams' evidence is persuasive.  Through Keyser's email, in particular, Williams has marshalled the "existence of facts that suggest[] that the adverse action occurred because of the protected activity." *Roberts*, 998 F.3d at 123 (internal quotation marks omitted).  A reasonable jury could, based on this record, find that the demotion occurred due to Williams' departure for leave and request for an accommodation.  Accordingly, the court will deny Defendants' motion for summary judgment with respect to Count II.

## B.    Count III (ADA Interference)

Williams also alleges an ADA interference claim.  (Compl. ¶¶ 74–83.)  Specifically, Williams alleges that after he revealed his disability to his supervisor, he "was discouraged from discussing his disabilities further, was disciplined, was not offered the opportunity to engage in the interactive process, his accommodation requests were ignored, and he was ultimately demoted and constructively discharged." (*Id.* ¶¶ 78–79.)

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).  To prove an ADA interference claim, a plaintiff must show that (1) he engaged in an activity that is statutorily protected by the ADA; (2) he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the employer coerced, threatened, intimidated, or interfered on account of plaintiff's protected activity; and (4) the employer was motivated by an intent to discriminate. *Sowers v. Bassett Furniture Indus., Inc.*, No. 4:19-cv-00039, 2021 WL 276169, at *9 (W.D. Va. Jan. 27, 2021).  For several reasons,

Defendants have shown that there is no genuine dispute of material fact as to whether they interfered with Williams' ADA rights.

First, Williams' interference claim primarily alleges that B-A-R-C interfered with his ADA rights by discriminating against him, by failing to accommodate his disability, and by retaliating against him. (*See* Compl. ¶ 79.) But those complaints are duplicative of Williams' discrimination, retaliation, and failure to accommodate claims. *See Sowers*, 2021 WL 276169, at *9 (granting summary judgment on an interference claim that is "indistinguishable from a standard failure-to-accommodate claim"); *Keith v. Volvo Grp. N. Am., LLC*, No. 7:20-cv-00521, 2023 WL 234780, at *10 (W.D. Va. Jan. 18, 2023) (same), *aff'd*, No. 23-1178, 2024 WL 1193096 (4th Cir. Mar. 20, 2024). To the extent that Williams' ADA interference claim directly overlaps with ADA retaliation or failure to accommodate, that portion of the claim is disposed of in conjunction with those other claims. Accordingly, the court construes Williams' ADA interference claim to concern solely the allegation that he was discouraged from discussing his disabilities further following a March 2018 meeting.

Second, to the extent Williams' claim is based on the allegation that he "was discouraged from discussing his disabilities further" after he "revealed his disability to supervisory employees," (Compl. ¶¶ 78–79), it fails on the merits. It is undisputed Williams disclosed his major depression diagnosis during the March 2018 meeting, (Williams Dep. at 64:6–9), years before any alleged adverse action. Additionally, there is no dispute that at that time, he did not ask for an accommodation. (*Id.* at 64:10–16.) Nor did anyone threaten him, coerce him, intimidate him, or interfere with his care for major depression. (*Id.* at 64:17–65:7; *see also id.* at 66:7–13.) On this record, no reasonable jury would find that B-A-R-C coerced,

threatened, intimidated, or interfered on account of Williams' disclosure. *Sowers*, 2021 WL 276169, at *9.

Third, the allegations concerning discouragement from discussion likewise fail for other reasons, too. Williams does not dispute that he filed an EEOC Charge on June 1, 2021, specifying coverage of events from September 1, 2020 through January 14, 2021. (*See* Keyser Aff. Ex. B.) Those allegations describing events from March 2018 predate the timeframe Williams himself identified in his EEOC Charge. Moreover, it remains unclear whether Williams' interference claim is administratively exhausted. His EEOC Charge does not appear to mention his later allegation in federal court that Keyser warned Williams "not to discuss his disability with other B-A-R-C employees." (*Compare* Compl. ¶ 21 *with* Keyser Aff. Ex. B at 8–9.) In general, "factual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

At bottom, Williams has not marshalled evidence creating a genuine dispute of material fact as to whether Defendants interfered with his rights in violation of the ADA. Accordingly, Defendants' motion for summary judgment on Count III will be granted.

## C.     Count IV (ADA Failure to Accommodate)

Finally, Williams alleges a failure to accommodate claim under the ADA. In particular, he claims that B-A-R-C failed to accommodate him "by refusing to appropriately engage in a dialogue with him regarding accommodations, intimidating and discouraging Mr. Williams from pursuing his accommodation requests, and essentially denying Mr. Williams's accommodation requests by ignoring them for an extended period of time, then demoting Mr.

Williams rather than granting a reasonable accommodation, ultimately resulting in Mr. Williams's unlawful constructive discharge from employment."  (Compl. ¶ 88.)

The ADA provides a cause of action to a "qualified individual" with a disability whose employer fails to make a reasonable accommodation to a known physical or mental limitation unless the employer can demonstrate that the requested accommodation would impose an undue hardship.  42 U.S.C. § 12112(b)(5)(A).  To succeed on a failure to accommodate claim, a plaintiff must show that (1) the plaintiff is a qualified individual with a disability; (2) the employer had notice of the plaintiff's disability and request for accommodation; and (3) the employer failed to accommodate the plaintiff.  *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 579–80 (4th Cir. 2015).

### 1.    Williams is not a "qualified individual" under the ADA.

"The ADA provides that '[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual.'"  *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 212 (4th Cir. 1994) (quoting 42 U.S.C. § 12112(a)).[3]  Under the statutory definition, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); *see Wirtes v. City of Newport News*, 996 F.3d 234, 238 (4th Cir. 2021).  To determine whether a plaintiff meets this definition, the court considers: "(1) whether [he] could perform the essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue, and (2) if not, whether any

---

[3] Defendants concede the existence of a "disability" for the purposes of resolving the summary judgment motion.  (Dkt. 27 at 10 n.2.)

reasonable accommodation by the employer would enable [him] to perform those functions."
*Tyndall*, 31 F.3d at 213 (internal quotation marks omitted).

Based on the facts in the record, a reasonable jury could not find that Williams is a
qualified individual under the ADA. Specifically, to prove he is a qualified individual, Williams
needs to "possess[] the skills necessary to perform the job in question," and also "be willing
and able to demonstrate these skills by coming to work on a regular basis." *Id.* However,
Williams is not a "qualified individual" because he was unable to serve as a "Network
Engineer" from both a skills perspective and a medical perspective. (Dkt. 27 at 10–11.)

First, by his own admission, Williams lacks skills needed to serve in the role of
"Network Engineer." In his deposition, Williams agreed that he did not "have the skill set of
a full network engineer" and instead "had the skill set of an assistant or junior network
engineer." (Williams Dep. at 147:24–148:5.) Indeed, Williams readily admitted that he was
"effectively a junior network engineer." (*Id.* at 93:16–17, 94:4–6.) That's largely because
Williams lacked a background in "wide area fiberoptic network," which was "a large part of
the work that [B-A-R-C] did." (*Id.* at 93:18–94:1.) And Williams readily admitted that he did
not "have the network engineering knowledge, skill, and experience necessary to support [B-
A-R-C's] needs when [Sickler] left." (*Id.* at 94:12–17; *see also id.* at 108:23–109:4 ("There were
[network engineer duties] that were technically beyond my capabilities.").) While Williams was
assigned network engineering duties at times, many "were beyond [his] expertise" because he
was "effectively a junior network engineer," (*id.* at 108:1–7), who "assist[ed] network
engineers," (*id.* at 245:9–11).

Though Williams counters with other deposition portions, it is not enough to establish a specific material dispute of fact regarding his lack of skill to function as a Network Engineer. First, Williams cites his own deposition testimony in which he agreed he performed assigned tasks "capably" and received "average and above average performance ratings." (Dkt. 28 at 3 (quoting Williams Dep. at 70:9–15).) But in reviewing that testimony in full, Williams simply confirms the details of allegations asserted in his complaint. (*See* Williams Dep. at 69:13–70:15.) Specifically, in that section Defendants' counsel reviewed specific allegations in paragraph 23 of the complaint by reading directly from it. (*Id.* at 69:18; *see also id.* at 70:6–10 (referencing Williams' "allegation").) The complaint alleged that "[d]espite the uptick in work," Williams "performed well" and "consistently received average and above average performance ratings"—precisely what Williams confirmed. (Compl. ¶ 23.) Williams' confirmation of material contained within the pleadings does not create a genuine dispute of material fact as to whether he was actually qualified to serve as a Network Engineer. Second, Williams cites the testimony of Sickler—Williams' direct supervisor at one point—who found Williams to be a "good employee," "good worker," "dependable," and that he "me[t] the requirements of the job." (Sickler Dep. at 13:14–14:18.) But Sickler's generalized answer still does not dispute that Williams was unqualified to serve as a Network *Engineer* in August 2020, given the fact that Williams functionally served as a junior network engineer assisting Sickler, and the fact that Sickler left in May 2020. Third, Williams points out that in his performance evaluation for July 2019 to June 2020, Lowry rated him with scores of 3 and 4 out of 5—average and above average. (*See* Dkt. 28-1.) But these scores do little to dispute whether Williams possessed the requisite skills of a Network Engineer. For one thing, the review does

not shed light on Williams' technical knowledge, and instead attempts to measure whether Williams demonstrated and fulfilled "each of the core BARC values." (*Id.*) Those values include integrity, dependability, respectfulness, being member-driven, excellence, innovativeness—but do not refer to whether Williams was adequately and technically skilled for his role. (*Id.*) Instead, the review likely serves to show that B-A-R-C was pleased with Williams' performance (as effectively a junior network engineer) during the July 2019 to June 2020 timeframe, and is not an assessment of his credentials.

However, even assuming Williams possessed the skills required to serve as a "Network Engineer," Williams does not dispute that he was medically unable to return to work. In Williams' FMLA paperwork, his healthcare provider stated that he will be "incapacitated" for his "lifetime," (Dkt. 26-25 at 8), and that he is not able to perform the essential function of "[c]ollaboration with upper management," (*id.* at 9). Additionally, in his resignation letter to B-A-R-C, Williams' counsel relayed that his healthcare provider "advised [him] that he *should not return to work* at BARC due to health concerns." (Keyser Aff. Ex. A at 6 (emphasis added).) Williams provides no response to these statements or Defendants' argument. Thus, Defendants claim, and the court finds persuasive, that Williams was medically unable to return to work as a Network Engineer is undisputed.

A plaintiff is not a qualified individual if they are not allowed to return to work by their healthcare provider. *See Crow v. McElroy Coal Co.*, 290 F. Supp. 2d 693, 696–97 (N.D.W. Va.) (holding that without a release to work from the plaintiff's doctor, the plaintiff cannot be a qualified individual), *aff'd*, 77 F. App'x 649 (4th Cir. 2003); *Gower v. Wrenn Handling, Inc.*, 892 F. Supp. 724, 727 (M.D.N.C. 1995) (same); *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F.

Supp. 2d 589, 594 (S.D.W. Va. 2008) ("It is well-settled that an individual who has not been released to work by his or her doctor is not a 'qualified individual with a disability.'").  That's because attending one's job is an essential function.  *Tyndall*, 31 F.3d at 213.  Williams did not receive a work release from his healthcare provider, permitting him to return to his job, from August 2020 until his resignation in January 2021.  Instead, his healthcare provider wrote that due to his condition of "major depression," he "will be incapacitated for a *continuous* period of time," beginning on August 4, 2020 and lasting through his "lifetime."  (Dkt. 26-25 at 8 (emphasis added).)  That information reflects his healthcare provider's "best estimate" based her "medical knowledge, experience, and examination of" Williams.  (*Id.*)

At bottom, a reasonable jury would not find that Williams was a qualified individual under the ADA because he lacks the requisite skills of a Network Engineer and remains medically unavailable to return to work at B-A-R-C.  Accordingly, Defendants' motion for summary judgment on Count IV will be granted.

## IV.    Conclusion

For the reasons outlined above, the court will **GRANT in part**, and **DENY in part**, Defendants' motion for summary judgment (Dkt. 26).  The court will **GRANT** Defendants' motion for summary judgment with respect to Counts I, III, IV, V, and VI.  The court will **DENY** Defendants' motion for summary judgment with respect to Count II.

An appropriate Order will accompany this Memorandum Opinion.

ENTERED this 23rd day of May, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE